**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X

Marta Giron,

> Plaintiff,

-against-

Kilolo Kijakazi, Acting Commissioner of Social
Security Administration,

> Defendant,

Social Security Administration,

> Interested Party.

---------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/19/2023

7:22-cv-06226-VR

<u>**OPINION & ORDER**</u>

**VICTORIA REZNIK, United States Magistrate Judge:**

Plaintiff Marta Giron brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final determination of the Commissioner of Social Security (the "Commissioner"), denying Giron's application for disability insurance benefits. On February 8, 2023, the parties consented to jurisdiction before a magistrate judge for all purposes, pursuant to 28 U.S.C. § 636(c). (ECF No. 21 (Consent)).

The parties now cross-move for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (ECF Nos. 17 (Plaintiff's Mot.), 22 (Commissioner's Cross-Mot.), 23 (Commissioner's Mem.)). For the reasons articulated below, Giron's motion is **DENIED**, and the Commissioner's motion is **GRANTED**.

## I.    <u>BACKGROUND</u>

The following facts are taken from the administrative record of the Social Security Administration, filed by the Commissioner on November 7, 2022. (ECF Nos. 16, 16-1, 16-2, 16-

1

3 (SSA Record)).[1]

## A.      Application History

On August 21, 2018, Giron applied for disability benefits, alleging that she had been

disabled since January 17, 2018.  (ECF No. 16 at 296–99).[2]  As explained below, Giron suffered

neck, back, shoulder, hip, and right-hand injuries in a motor vehicle accident in January 2018.

Subsequently, Giron was diagnosed and treated for Kienböck's disease and carpal tunnel

syndrome.  On November 1, 2018, the Commissioner informed Giron that her claim had been

administratively denied.  (*Id.* at 70–80, 105–09).  Giron requested a hearing before an

Administrative Law Judge (ALJ).  (*Id.* at 111).  On October 15, 2019, ALJ Brian W. Lemoine

held a video hearing.[3]  (*Id.* at 87).  At that hearing, Giron appeared with counsel and testified

with the assistance of a Spanish interpreter.  (*Id.* at 87, 143).  On October 28, 2019, the ALJ

issued a written decision, in which he concluded that Giron was not disabled within the meaning

of the Social Security Act.  (*Id.* at 87–94).  Giron sought review from the Appeals Council (*id.* at

210–12), which remanded to the ALJ for further proceedings on August 19, 2020 (*id.* at 100–01).

On November 19, 2020, the ALJ held a telephone hearing, during which Giron appeared with

counsel and testified with the assistance of an interpreter.  (*Id.* at 48–69).  On December 3, 2020,

the ALJ issued a second written decision, in which he again concluded that Giron was not

disabled.  (*Id.* at 34–42).  The ALJ reasoned that Giron maintained a residual functional capacity

to perform a reduced range of sedentary work requiring only occasional postural activities and up

---

[1] The Court conducted a plenary review of the entire administrative record, familiarity with which is presumed.  The Court assumes knowledge of the facts surrounding Giron's medical history and does not recite them in detail, except as relevant to the analysis set forth in this Opinion and Order.

[2] All page numbers to documents filed on ECF refer to pdf pagination, not the sequential numbering of the SSA Record provided on the bottom right corner of the page.

[3] A transcript of the video hearing on October 15, 2019, does not appear within the administrative record.

to frequent manipulation with the right dominant hand.  (*Id.* at 38).  The ALJ relied on a vocational expert's testimony that an individual with Giron's limitations could perform sedentary work, including the duties of an assembler, polisher, and inspector.  (*Id.* at 42).  Giron again sought review from the Appeals Council (*id.* at 291–92), who denied her request on May 20, 2022 (*id.* at 5–8).  This action followed.  (ECF No. 1).

**B.      Record Before the ALJ**

As described below, the record before the ALJ includes three years of medical records, treatments, and examinations, stemming from Giron's motor vehicle accident in January 2018.

1.   Motor Vehicle Accident and Diagnostic Imaging (Jan.-May 2018)

On January 17, 2018, Giron appeared at the St. Luke's Cornwall Hospital emergency room.  (ECF No. 16-1 at 15, 18–20).  She reported having been in a motor vehicle accident and complained of shoulder and neck pain.  (*Id.* at 19).  An examination revealed mild tenderness of the right shoulder.  (*Id.* at 19–20).  A cervical spine x-ray revealed "no acute fracture or subluxation," that "[t]he vertebral body heights and disc spaces [were] maintained," and there was "[n]o prevertebral soft tissue swelling."  (*Id.* at 24).  Diagnostic imaging of the right shoulder returned "[n]egative" and "[n]ormal," with "[n]o significant arthropathy or acute abnormality."  (*Id.* at 26).

A hip x-ray taken in January 2018 revealed osteoarthritis.  (ECF No. 16-2 at 143).  MRIs taken in February 2018 revealed rotator cuff tears of both shoulders, biceps tenosynovitis, tendinosis, lumbar herniation, cervical bulges, spinal stenosis, cystic changes of the carpal bones, and abnormal appearance of the humate bone, which was consistent with Kienböck's disease.  (ECF Nos. 16-1 at 32–35, 61; 16-3 at 57–63).  An MRI in May 2018 revealed a partial rotator cuff tear and bicep tendonitis.  (ECF No. 16-1 at 36).

2.  Dr. David Gamburg (treating physician) (Jan.-May 2018)

In January 2018, Dr. David Gamburg examined Giron and observed limited range of motion of the lumbar spine, but no gross neurological deficits.  (ECF No. 16-1 at 37).  In May 2018, Giron reported neck pain radiating to her right upper extremity and non-radicular back pain.  (*Id.* at 38).  Dr. Gamburg observed that Giron had tenderness in the C5-6 and L4-5 distributions, intact sensation in the lower extremities, and negative straight leg elevation.  (*Id.*).  Dr. Gamburg recommended a cervical epidural steroid injection and lumbar facet block, (*id.*), but the record does not reveal whether these procedures were performed.

3.  Dr. Curtis Blumenthal (treating chiro) (Jan.-Sept. 2018)

Between January and September 2018, Dr. Curtis Blumenthal, D.C., provided chiropractic therapeutics for hand, hip, neck, and back pain.  (*See generally* ECF No. 16-1 at 28–31, 39–48, 64–225; ECF No.16-2 at 1–9, 18–33, 38–142, 193–237).[4]  During the January 2018 visit, Giron reported that she was experiencing hand, hip, neck, and back pain "between 76 and 100% of the time" and she rated the pain intensity as nine out of ten.  (ECF No. 16-1 at 28).  Upon examination, Dr. Blumenthal diagnosed cervical joint dysfunction, a cervical whiplash injury sprain/strain, cervical plexopathy, thoracic joint dysfunction, a thoracic sprain/strain, lumbar joint dysfunction, lumbar plexopathy, a lumbar sprain/strain, sacroiliac joint dysfunction, and a shoulder injury.  (*Id.* at 30).

In June 2018, Dr. Blumenthal noted that Giron had received conservative treatment, which had afforded "minimal relief," and recommended manipulation under anesthesia (MUA).  (*Id.* at 41).  In July 2018, Dr. Blumenthal performed two MUA procedures on the cervical and lumbar spine and the sacroiliac joints.  (*Id.* at 43–48, 216, 221).

---

[4] The cited page ranges reflect Dr. Blumenthal's treatment notes from January to September of 2018.

Between January and September 2018, Dr. Blumenthal observed that Giron had a limited range of motion of the shoulders.  (*See generally id.* at 28–59, 62–225; ECF No. 16-2 at 1–237).

Dr. Blumenthal also provided Giron with forms, which indicated (by checking a box) that Giron was "Totally Disabled" and "May not return to work."  (ECF No. 16-2 at 18–27, 193–202).  Most of the forms did not explain the basis for these conclusions; some identified medical diagnoses codes (without elaboration) in the comments section of the form.  (*See id.*).

4.  <u>Dr. Matthew Wert</u> (treating surgeon) (March 2018-June 2018)

In March 2018, Dr. Matthew Wert, an orthopedic surgeon, examined Giron, diagnosed a right shoulder partial rotator cuff tear, and recommended right shoulder arthroscopy.  (ECF No. 16-1 at 49–51).  Several weeks later, Dr. Wert operated on Giron, and his postoperative diagnoses were a labrum tear, subacromial bursitis, rotator cuff tear, hypertrophic synovitis, impingement syndrome, biceps tendon tear, adhesions, and hypertrophy of the acromioclavicular joint.  (*Id.* at 52).  Giron followed up with Dr. Wert in April and June 2018 and exhibited normal range of motion in each shoulder.  (*Id.* at 56, 58).

5.  <u>Dr. Richard Magill</u> (treating ortho) (Oct. 2018-Sept. 2020)

Between October 2018 and September 2020, Dr. Richard Magill provided orthopedic treatment.  (ECF No. 16-3 at 22–136).  In October 2018, Giron presented for an evaluation of her right wrist.  (*Id.* at 119–21).  Dr. Magill assessed that Giron suffered from Kienböck's disease.  (*Id.* at 121).  In November 2018, Giron underwent right radial shortening osteotomy for Kienböck's disease.  (*See id.* at 115–19).  An x-ray in January 2019 revealed a healed osteotomy plate.  (*Id.* at 1, 8).  On physical examination, Giron had restricted wrist motion, but her digital motion, supination, and pronation were intact.  (*Id.* at 1).

In March 2019, Dr. Magill assessed that Giron had developed carpal tunnel symptoms; he

recommended therapy and wearing a brace at night.  (*Id.* at 80–81).  An EMG in April 2019 showed "bilateral median neuropathy at the wrist, worse on the right."  (*Id.* at 4).  In July 2019, Dr. Magill noted that an EMG was positive for carpal tunnel syndrome, and he prescribed Ibuprofen.  (*Id.* at 51).  In August 2019, Giron received a cortisone injection.  (*Id.* at 48).  In September 2019, Giron reported that she was "feeling better" since the injection but still had "some discomfort" with wrist motion.  (*Id.* at 44, 107).  In November 2019, Dr. Magill and Giron decided to pursue surgical treatment.  (*Id.* at 42).  In December 2019, Giron underwent right carpal tunnel release.  (*Id.* at 23–24).  Ten days later, Giron reported feeling better.  (*Id.* at 39). In February 2020, Giron reported improvement as to numbness and tingling.  (*Id.* at 36).  In June 2020, Dr. Magill noted that Giron was "doing well" following the right carpal tunnel release and that she was experiencing "some basal joint arthritis which [was] mildly symptomatic" following the radial shortening osteotomy for Kienböck's disease.  (*Id.* at 33).  During that visit, Giron complained of pain in the right long finger and difficulty bending it.  (*Id.*).  In August 2020, Giron received a cortisone injection into her right finger tendon.  (*Id.* at 30).  In September 2020, Dr. Magill noted that Giron was "doing well" following the injection.  (*Id.* at 27).  On examination, Giron had tenderness to palpation, restricted wrist flexion, and pain with a grind test, but her sensation was intact, and she could flex and extend her digits without difficulty. (*Id.*).  Dr. Magill prescribed Ibuprofen.  (*Id.*).

During visits with Dr. Magill, Giron denied back pain.  (*See id.* at 27, 30, 33, 39, 41, 44, 47, 50, 74, 81, 83, 95, 100–01, 105, 107, 109, 113, 115–17, 120).

6.  <u>State Agency Consultants</u> (Oct. 2018)

In October 2018, Dr. Paul Mercurio, a state agency consultant, examined Giron.  (ECF No. 16-2 at 238–41).  Giron "appeared to be in no acute distress."  (*Id.* at 239).  Her gait was

"normal," she was able to walk and rise from a chair without difficulty, she performed a full squat, used no assistive devices, and required no help getting on and off the examination table. (*Id.*). Examination of the cervical and lumbar spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. (*Id.* at 240). Extension of the right shoulder was limited to 90 degrees, but internal and external rotation of the shoulder was full. *Id.* No sensory deficits were noted, and she had full motor strength in the upper and lower extremities. (*Id.* at 239–40). She had 4/5 strength in the right hand but was able to zip and button. (*Id.* at 240). She reported taking Tylenol for pain. (*Id.* at 238). Dr. Mercurio diagnosed arthralgia of the right wrist, neck, bilateral shoulders, and back. (*Id.* at 241). He opined that Giron "would have no limitation for sitting, hearing, seeing, or speaking" and "would have mild limitation for prolonged standing, walking, climbing stairs, bending, lifting, carrying, reaching, or handling, especially where she would need use of her right hand." (*Id.*).

Dr. S. Siddiqui, another state agency consultant, reviewed Giron's file and issued a functional assessment. (ECF No. 16 at 74–77). Dr. Siddiqui assessed that Giron could perform light work, except that she could not frequently stoop or climb ramps, stairs, ladders, ropes, or scaffolds, and she was limited to occasional overhead reaching with the right upper extremity. (*Id.* at 75–76).

7. November 2020 ALJ Hearing

At the November 2020 ALJ hearing, Giron, represented by counsel, testified with the assistance of an interpreter, as follows. (ECF No. 16 at 54–57). Since the October 2019 hearing, her right hand had "been getting worse." (*Id.* at 55). She was unable to lift, grip, handle, or "do anything" with that hand and she was unable to bend her fingers. (*Id.* at 55–56). Her neck and shoulder "have been very bad." (*Id.*). Her pain was "permanent," but she was taking prescribed

pain medication.  (*Id.*).  Her daughter assisted with household chores and grocery shopping, which she was unable to do on her own.  (*Id.* at 56–57).

The ALJ called Francisco Fazzolari, a vocational expert, to testify.  (*Id.* at 52, 59–67). The ALJ explained that the October 2019 hearing had revealed as follows.  (*Id.* at 59–60).  First, Giron had previously worked as a food service employee at a summer camp, classified as a cafeteria attendant, DOT Code 311.677-010, SVP 2,[5] with a light exertion level.  (*Id.* at 60). Second, Giron had previously worked as a hospital cleaner at West Point and as a Wal-Mart employee, where she performed cleaning, maintenance, and inventory stocking.  (*Id.* at 59–60). The composite for these two jobs were laborer or building maintenance, DOT Code 381.687-014, SVP 2, and stock clerk, DOT Code 299.367-014, SVP 4, and both jobs were classified as "heavy" exertion levels.  (*Id.* at 59–60).  Fazzolari stated that he would have classified these jobs as cleaner, DOT Code 323.687-010, SVP 2, medium exertion; store laborer, DOT Code 922.687-058, SVP 2, medium exertion; janitor, DOT Code 382.664-010, SVP 3, medium exertion; and server, DOT Code 311.677-014, SVP 3, light exertion.  (*Id.* at 64–65).  The ALJ agreed that the "medium," rather than "heavy," exertion classifications were "probably more consistent with the information in the file."  (*Id.* at 64).

Fazzolari confirmed that a hypothetical person who was limited to sedentary work, and was of the same age, education, work history, and limitations as Giron, would not be able to engage in Giron's past relevant work because those jobs required more than sedentary exertion. (*Id.* at 65–66).  However, such a person, who was capable of frequent fine fingering and

---

[5] "SVP" stands for "Specific Vocation Preparation."  *Blau v. Berryhill*, 395 F. Supp. 3d 266, 270 (S.D.N.Y. 2019). SVP is defined "as the 'amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.'"  *Id.* at 270 n.2 (quoting *O\*NET OnLine Help*, O\*NET ONLINE, https://www.onetonline.org/help/online/svp (last visited June 28, 2023)).  "The SVP 'levels' correspond to time periods."  *Id.*  For example, Level 2 is "[a]nything beyond short demonstration up to and including 1 month" and Level 4 is "[o]ver 3 months up to and including 6 months." *O\*NET OnLine Help*, *supra*.

handling, could perform the duties of: (1) an assembler, DOT Code 713.687-018, SVP 2, sedentary exertion, with approximately 16,000 jobs nationally; (2) a polisher, DOT Code 713.684-038, SVP 2, sedentary exertion, with approximately 14,000 jobs nationally; and (3) an inspector, DOT Code 669.687-014. SVP 2, sedentary exertion, with approximately 20,000 jobs nationally.  (*Id.* at 66).  Yet, if such a person was further limited to occasional fine fingering and handling with the right dominant hand, then the person would not be able to perform the duties of those three jobs or any other jobs because such a limitation would significantly erode the sedentary job base.  (*Id.* at 66–67).

## II.   <u>LEGAL STANDARDS</u>

### A.   **Standard of Review**

This Court "engage[s] in limited review" of the Commissioner's decision.  *Schillo v. Saul*, 31 F.4th 64, 74 (2d Cir. 2022).  The Court "conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied."  *Id.*; *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  "The substantial evidence standard is a very deferential standard of review," such that it is not the function of the Court "to determine *de novo* whether a plaintiff is disabled."  *Schillo*, 31 F.4th at 74 (internal quotation marks omitted).  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (internal quotation marks omitted).  "[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  *Id.*  "If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld."  *Id.*

"[O]nce an ALJ finds facts, [this Court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Id.* (internal quotation marks omitted).

However, "where an error of law has been made that might have affected the disposition of the case, this [C]ourt cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (alteration and internal quotation marks omitted). Thus, "[f]ailure to apply the correct legal standards is grounds for reversal." *Id.* "When there are gaps in the administrative record or the ALJ has applied an improper legal standard," or when the ALJ's rationale is unclear in relation to the evidence in the record, the Court may remand to the Commissioner "for further development of the evidence" or for an explanation of the ALJ's reasoning. *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996); *accord Fowlkes v. Adamec*, 432 F.3d 90, 98 (2d Cir. 2005).

### B.      Statutory Disability

Under the Social Security Act, a claimant is disabled when the claimant lacks the ability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *Schillo*, 31 F.4th at 69–70. The claimant is eligible for disability benefits

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

The Social Security Regulations, 20 C.F.R. § 404.1520(a)(4)(i)–(v), set forth a five-step

sequential analysis for evaluating whether a person is disabled under the Social Security Act.

*See Schillo*, 31 F.4th at 70.  "If at any step a finding of disability or nondisability can be made, the Commissioner will not review the claim further."  *Id.* (alteration and internal quotation marks omitted).  Under the five-step process, the Commissioner determines the following:

> (1) whether the claimant is currently engaged in substantial gainful activity;
> (2) whether the claimant has a severe physical or mental impairment, or combination of severe impairments;[6]
> (3) whether the impairment (or combination) meets or equals the severity of one of the impairments specified in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing of Impairments");[7]
> (4) whether, based on an assessment of the claimant's residual functional capacity (RFC), the claimant can perform any of her past relevant work;[8] and
> (5) whether the claimant can make an adjustment to other work given the claimant's residual functional capacity, age, education, and work experience.[9]

*Schillo*, 31 F.4th at 70 (citing 20 C.F.R. § 404.1520(a)(4)(i)–(v)).  "At step three, the [Commissioner] determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies."  *Barnhart v. Thomas*, 540 U.S. 20, 24–25 (2003).  However, "[i]f the claimant's impairment is not on the list, the inquiry proceeds to step four."  *Id.*  "The claimant bears the burden of proof in the first four steps of the sequential inquiry."  *Schillo*, 31 F.4th at 70.  "In step five, the burden shifts, to a limited extent, to the Commissioner to show that other work

---

[6] A severe impairment is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c), 416.920(c).

[7] Listed impairments are presumed severe enough to render an individual disabled, and the criteria for each listing are found in Appendix 1 to Part 404, Subpart P of the SSA regulations.  20 C.F.R § 404.1520(a)(4)(iii), (d), 416.920(a)(4)(iii), (d).  If the claimant's impairments do not satisfy the criteria of a listed impairment at step three, the Commissioner moves on to step four and must determine the claimant's residual functional capacity ("RFC").  20 C.F.R. §§ 404.1520(e), 416.920(e).

[8] A claimant's RFC represents "the most [the claimant] can still do despite [their] limitations."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

[9] To support a finding that the claimant is disabled, there must be no other work existing in significant numbers in the national economy that the claimant, considering his or her RFC and vocational factors, can perform.  20 C.F.R. § 404.1560(c).

exists in significant numbers in the national economy that the claimant can do." *Id.* "Because the shift in step five is limited, the Commissioner need not provide additional evidence of the claimant's residual functional capacity." *Id.* (internal quotation marks omitted).

### III.   THE ALJ'S DECISION

To assess Giron's disability claim, the ALJ applied the five-step sequential analysis. (ECF No. 16 at 35–42); 20 C.F.R. § 404.1520(a)(4)(i)–(v).   At step one, the ALJ concluded that Giron had not engaged in substantial gainful activity since January 17, 2018, the alleged onset date.   (ECF No. 16 at 36).   At step two, the ALJ concluded that Giron had the following severe impairments: Kienböck's disease of the right wrist; bilateral carpal tunnel syndrome; arthritis of the first carpometacarpal of the right hand; disc bulging/herniation of the cervical and lumbar spine; and partial rotator cuff tear and bicep tendonitis of the shoulders.   (*Id.* at 37).

At step three, the ALJ determined that Giron's impairments, individually or combined, did not meet, or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.   (*Id.* at 37–38).   Specifically, the ALJ found that Giron's impairments did not meet or medically equal Listing 1.02 (major disfunction of a joint(s)), because the evidence did not reveal an inability to perform fine and gross movement effectively. (*Id.* at 37).   The ALJ also found that Giron's impairments did not meet or medically equal Listing 1.04 (disorders of the spine), because the evidence did not reveal a nerve compression characterized by motor loss, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication.   (*Id.* at 38).

At step four, the ALJ assessed Giron's residual functional capacity (RFC) as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she can do no more than occasional postural positions to include crouching, crawling, stooping, kneeling, balancing, and

climbing of stairs; and is capable of up to frequent fine fingering and handling with
the right dominant hand.

(*Id.* at 38).  In reaching this conclusion, the ALJ "considered all symptoms and the extent to

which these symptoms can reasonably be accepted as consistent with the objective medical

evidence and other evidence" in accordance with 20 C.F.R. § 404.1529 and Social Security

Ruling 16-3p.  (*Id.*).

The ALJ's RFC determination used a two-step process.  First, the ALJ found that the

evidence revealed medical impairments that could reasonably be expected to cause the symptoms

Giron had alleged.  (*Id.* at 40).  Second, the ALJ determined that Giron's "statements concerning

the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent

with the medical evidence and other evidence in the record."  (*Id.*).  The treating source records

and findings of the consultative physician supported a conclusion that Giron's right hand was

functional with some limitations.  (*Id.*).  Her symptoms had been managed with treatment and

did not require "pain medication aside from Ibuprofen and Tylenol."  (*Id.*).  The treatment

records received before the hearing did warrant reducing the residual functional capacity to the

sedentary exertional level, but the evidence showed that the "right hand remain[ed] capable of at

least frequent fingering/handling."  (*Id.*).

The ALJ found Dr. Mercurio's opinion persuasive that Giron "would have no limitation

for sitting, hearing, seeing, or speaking and would have mild limitation for prolonged standing,

walking, climbing stairs, bending, lifting, carrying, reaching, or handling, especially where she

would need use of her right hand."  (*Id.*).  The ALJ found Dr. Siddiqui's finding unpersuasive

that Giron "could perform light work except frequently climbing ramps/stairs and

ladders/ropes/scaffolds, stooping, and limited overhead reaching with the right upper extremity."

(*Id.*).  The ALJ noted that the record contained numerous opinions from Dr. Blumenthal but

found those opinions "vague and conclusory." (*Id.* at 40–41).

At step five, the ALJ concluded that based on Giron's age (46 years old), education (limited), work experience (as a cleaner, store laborer, janitor, and server), and residual functional capacity, there were jobs in significant number in the national economy that Giron can perform. (*Id.* at 41). The ALJ credited the vocational expert's testimony that an individual with Giron's age, education, work experience, and residual functional capacity could perform the duties of an assembler, polisher, and inspector. (*Id.* at 42). Thus, Giron was "not disabled." (*Id.*).

## IV.   **DISCUSSION**

Giron argues that the ALJ erred in (1) determining her RFC without support of substantial evidence (in step four) and (2) failing to resolve a conflict between the vocational expert testimony and the DOT (in step five). (ECF No. 17 at 9–19). As detailed below, the Court finds that the ALJ's decision regarding Giron's RFC is supported by substantial evidence and that no legal error exists regarding the ALJ's assessment of the vocational expert testimony.

### A.   **The ALJ's Residual Functional Capacity Determination Was Supported By Substantial Evidence.**

Giron first argues that the ALJ erred in determining her RFC without support of substantial evidence (in step four). Giron makes two primary arguments: (1) the ALJ failed to credit her subjective complaints and (2) the ALJ only considered evidence supportive of his determination (otherwise known as cherry-picking). (ECF No. 17 at 9–17). As explained below, the Court finds that the ALJ properly assessed Giron's subjective complaints and did not cherry-pick the record when making the RFC determination. Rather, the ALJ's RFC determination is substantially supported by the record evidence, which was appropriately considered. The Court first lays out the substantial evidence supporting the ALJ's determination, and then addresses

14

each of Giron's arguments below.

1. <u>Substantial Evidence Supporting the ALJ's Determination</u>

The ALJ determined that Giron had the residual functional capacity to perform sedentary work,[10] "except she can do no more than occasional postural positions to include crouching, crawling, stooping, kneeling, balancing, and climbing of stairs" and that she "is capable of up to frequent fine fingering and handling with the right dominant hand."  (ECF No. 16 at 38).  In support of this finding, the ALJ extensively cited Giron's treating source records since her accident in January 2018, the findings of the consultative physician, and additional treatment records received after the prior hearing. (*Id.* at 38–41). As explained below, based on the Court's examination of the record, the Court finds that the ALJ's conclusions are supported by substantial evidence.

More specifically, the record reveals that Giron's medically determinable impairments could reasonably be expected to cause the symptoms she alleged – an issue undisputed by the parties. (*Id.* at 40).  However, the record also supports the ALJ's finding that Giron's subjective complaints about the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the record evidence.  (*Id.*).  As to Giron's right hand, the treating source records and the findings of the consultative physician support the ALJ's conclusion that Giron's right hand was functional with some limitations.  (*Id.*).  The record reveals that Giron was

---

[10] "'[S]edentary work' is generally defined as work in a sitting position for six hours of an eight-hour workday." *McIntyre v. Colvin*, 758 F.3d 146, 152 (2d Cir. 2014).

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

diagnosed with Kienböck's disease.  (ECF No. 16-3 at 121).  However, in November 2018, she

underwent right radial shortening osteotomy, and a January 2019 x-ray showed progressive

healing of the osseous fragments.  (*Id.* at 1, 8, 115–19).  During a January 2019 examination,

Giron had restricted wrist motion, but her digital motion, supination, and pronation were intact.

(*Id.* at 1).

The record also reveals that in March 2019, Giron was diagnosed with carpal tunnel

syndrome.  (*Id.* at 80–81).  However, the record also supports the ALJ's finding that subsequent

treatment appears to have been effective.  (ECF No. 16 at 39–40).  In September 2019, Giron's

carpal tunnel syndrome symptoms improved with a cortisone shot.  (ECF No. 16-3 at 44, 107).

In December 2019, Giron underwent right carpal tunnel release.  (*Id.* at 23–24).  In February

2020, Giron reported improvement as to numbness and tingling.  (*Id.* at 36).  In June 2020, Giron

was doing well following the right carpal tunnel release.  (*Id.* at 33).  Although Giron reported

wrist pain in August 2020, the pain was resolved following a cortisone shot.  (*Id.* at 30).  During

the September 2020 examination, Dr. Magill observed tenderness to palpation, restricted wrist

flexion, and pain with a grind test, but her sensation was intact, and she could flex and extend her

digits without difficulty and was prescribed more Ibuprofen.  (*Id.* at 27).  Thus, the record

evidence, including the treating source records and findings of the consultative physician,

substantially support the ALJ's conclusion that Giron's right hand was functional with some

limitations.

As for Giron's back and neck pain, the record reveals that she had such pain and limited

range of motion following the January 2018 motor vehicle accident.  But substantial evidence in

the record supports the ALJ's finding that Giron's back pain subsided after treatment and that

she consistently denied back pain in 2019 and 2020.  (ECF No. 16 at 39).  A January 2018

cervical spine x-ray revealed no acute disease.  (ECF No. 16-1 at 24).  On examination, Giron

had limited range of motion of the lumbar spine, but no gross neurological deficits.  (*Id.* at 37).

MRIs in February 2018 revealed bulging disc and herniation of the cervical and lumbar spine.

(*Id.* at 33–34).  Between January and September 2018, Giron received chiropractic care.  (*Id.* at

28–31, 39–48, 64–225; ECF No. 16-2 at 1–9, 18–33, 38–142, 193–237).  In May 2018, Giron

reported neck pain radiating to her right upper extremity and non-radicular back pain.  (*Id.* at 38).

On examination, Giron had tenderness in the C5-6 and L4-5 distributions, intact sensation in the

lowest extremities, and negative straight leg elevation.  (*Id.*).  While Dr. Gamburg recommended

a cervical epidural steroid injection and lumbar facet block, (*id.*), the record evidence does not

indicate that Giron received these treatments.  In July 2018, Giron underwent MUA.  (*Id.* at 43–

48, 216, 221).  During doctors' visits in 2019 and 2020, Giron denied back pain.  (*See* ECF No.

16-3 at 27, 30, 33, 39, 41, 44, 47, 50, 74, 81, 83, 95, 100–01, 105, 107, 109, 113, 115–17, 120).

As to Giron's right shoulder, the record reveals that Giron suffered injuries, pain, and

limited range of motion following the January 2018 accident.  But substantial evidence in the

record supports the ALJ's finding that Giron later received right shoulder arthroscopy and was

subsequently reported to be healing well.  (ECF No. 16 at 39).  A right shoulder MRI in February

2018 revealed biceps tenosynovitis, partial thickness rotator cuff tear, and tendinosis.  (ECF No.

16-1 at 32).  During chiropractic visits, Giron reported shoulder pain and was found to have

limited range of motion of the shoulders.  (*See generally id.* at 28–59, 62–225; ECF No. 16-2 at

1–237).  In March 2018, Giron underwent right shoulder arthroscopic surgery.  (ECF No. 16-1 at

52).  In April and June 2018, the right shoulder was healing well and Giron was undergoing

therapy.  (*Id.* at 56, 58).

As for the left shoulder, an MRI in May 2018 revealed a partial rotator cuff tear and bicep

tendonitis of the left shoulder, (ECF No. 16-1 at 36), but the record does not reveal whether Giron needed or received any further treatment for the left shoulder.

Dr. Mercurio's October 2018 consultive examination further provides substantial evidence to support the ALJ's RFC determination.  He observed that Giron appeared in no acute distress, with a normal gait and stance, was able to walk on heels and toes without difficulty, was able to perform a full squat, needed no help changing for the exam or getting on and off the examination table, and could rise from a chair without difficulty.  (ECF No. 16-2 at 239–40).  He further observed that Giron had full range of motion in the cervical and lumbar spine, full strength and range of motion in the lower extremities, and full strength and range of motion in the upper extremities except extension and abduction were limited to 90 degrees in the right shoulder.  (*Id.*).  He noted no sensory deficits.  (*Id.* at 240).  Giron had 4/5 strength in the right hand but was able to zip and button.  (*Id.*).  Giron reported taking Tylenol for pain.  (*Id.* at 238).  Based on the foregoing, Dr. Mercurio opined that Giron "would have mild limitation for prolonged . . . lifting, carrying, reaching, or handling, especially where she would need use of her right hand."  (*Id.* at 241).

Accordingly, there is substantial evidence, considering the record as a whole, to support the ALJ's determination of Giron's residual functional capacity (or RFC).

2.  Consideration of Giron's Subjective Complaints

Giron first challenges the ALJ's RFC determination by asserting various arguments that the ALJ failed to consider her subjective complaints.[11]  (ECF No. 17 at 14).  But this claim is belied by the ALJ's written decision, which explained how and why Giron's subjective

---

[11] As part of this argument, Giron raises issues about the staleness of the consultative opinions and the ALJ's statements that Giron's pain was treatable with pain medication.  (ECF No. 17 at 12, 15–17).  Each of these arguments is separately addressed below.

complaints were not supported by the findings in the record.  When making a residual functional capacity determination, "the ALJ is required to take the claimant's reports of pain and other limitations into account."  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam); *see* 20 C.F.R. § 416.929.  However, the ALJ "is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record."  *Genier*, 606 F.3d at 49.

"The regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations."  *Id.*  First, "the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged."  *Id.* (citing 20 C.F.R. § 404.1529(b)).  This requirement stems from the regulation that "subjective assertions of pain *alone* cannot ground a finding of disability."  *Id.* (citing C.F.R. § 404.1529(a)).  Second, "the ALJ must consider 'the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record."  *Id.* (alterations omitted) (quoting 20 C.F.R. § 404.1529(a)).

At the second step, the ALJ must consider all available evidence, including objective medical evidence and information regarding (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate symptoms; (5) any treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the symptoms.  20 C.F.R. § 404.1529(c)(3)(i)–(vii); *see also Genier*, 606 F.3d at 49 ("The ALJ must consider 'statements the claimant or others make about his impairments, his restrictions, his daily activities, his efforts

to work, or any other relevant statements he makes.'") (alterations omitted) (quoting 20 C.F.R. § 404.1512(b)(3)); *Snyder v. Saul*, 840 F. App'x 641, 643 (2d Cir. 2021) (Summary Order); SSR 16-3p, 2017 WL 5180304, at *7–8 (S.S.A. Oct. 25, 2017). "The ALJ need not discuss all the factors, however, as long as the decision includes precise reasoning, is supported by evidence in the case record, and clearly indicates the weight the ALJ gave to the claimant's statements and the reasoning for that weight." *Simmons v. Comm'r of Soc. Sec.*, 103 F. Supp. 3d 547, 569 (S.D.N.Y. 2015) (internal quotation marks omitted); *see Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) ("An ALJ does not have to state on the record every reason justifying a decision. Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted.") (internal quotation marks omitted).

Here, the ALJ appropriately considered Giron's subjective complaints (stated during her hearing testimony) that she suffered right hand pain, she could not bend her fingers or do anything with her hand, that her neck and shoulder had been very bad, and that she did not go shopping or outside on her own. (ECF No. 16 at 55–57). Under step one, the ALJ found that Giron's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (*Id.* at 38, 40). However, under step two, the ALJ found that Giron's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record" (*id.*), because "the allegations are not supported by the findings in the record" (*id.* at 40). As explained *supra* in Section IV.A.1, and as detailed in the ALJ's opinion, substantial record evidence indicates that Giron's symptoms were managed with treatment, to which she responded well, and that Giron generally did not require pain medication aside from Ibuprofen and Tylenol. (*Id.*). In addition, as the ALJ noted, "the treating source records and findings of the consultative physician support

a conclusion that [Giron's] right hand is functional with some limitations." (*Id.*).  For example, the ALJ noted that Giron's carpal tunnel syndrome symptoms improved after receiving cortisone injections and following carpal tunnel release.  (*Id.* at 39).  Moreover, in September 2020, Dr. Magill observed some tenderness, restricted flexion, and pain to the wrist, but determined that Giron's sensation was intact, she could extend her digits without difficulty, and was prescribed Ibuprofen.  (*Id.*).  Finally, Dr. Mercurio's assessment was not inconsistent with Giron's testimony because Dr. Mercurio did observe some weakness and pain to the right hand.  (ECF No. 16-2 at 240–41).  Thus, the ALJ did not fail to consider Giron's subjective complaints and committed no error by deciding not to credit them fully, given the contrary medical and other evidence in the record.

### a.   Staleness of the Consultative Opinions

In challenging the ALJ's decision to discredit Giron's subjective complaints, Giron also argues that the ALJ improperly relied upon Dr. Mercurio's consultative opinion (from October 2018), which became stale after Giron's subsequent surgical interventions and diagnoses of Kienböck's disease and carpal tunnel syndrome.  (ECF No. 17 at 12, 15–17).  "No case or regulation . . . imposes an unqualified rule that a medical opinion is superseded by additional material in the record."  *Camille v. Colvin*, 652 F. App'x 25, 28 n.4  (2d Cir. 2016) (Summary Order).[12] Rather, a medical opinion does not become stale when new material is added to the record unless the additional material raises doubts as to the reliability of the opinion.  *Id.* (holding that medical opinion was not rendered stale by subsequent treatment records two to nine

---

[12] The Court recognizes that under the Second Circuit's Local Rules, a "summary order do[es] not have precedential effect."  2d Cir. Loc. R. 32.1.1(a).  However, "this Court finds even the less-considered words of distinguished panels of judges highly persuasive."  *CFTC v. Int'l Fin. Servs.*, 323 F. Supp. 2d 482, 510 n.19 (S.D.N.Y. 2004).  Surely, such orders "are at least as valuable to a district [court] considering thorny legal issues as the musings of the authors of student law-review notes, which are freely citable."  *Id.*

months later, because medical opinions did not differ materially from each other).[13]

Here, the newly added treatment evidence does not render Dr. Mercurio's opinion stale, because it is consistent with Dr. Mercurio's opinion that Giron "would have mild limitation for prolonged . . . lifting, carrying, reaching, or handling, especially where she would need use of her right hand." (ECF No. 16-2 at 241). In making the RFC determination, the ALJ considered the subsequent treatment evidence as to Giron's Kienböck's disease and carpal tunnel syndrome. (ECF No. 16 at 38–39). The ALJ observed that Giron had been treated through right radial shortening osteotomy and right carpal tunnel release. (*Id.*). The ALJ further observed that following each procedure, Giron was doing well. (*Id.*). While Giron reported pain and/or discomfort in September 2019 and 2020, the subsequent treatment notes from Dr. Magill noted that she improved following cortisone injections. (*Id.* at 39). Notably, during the September 2020 examination, Dr. Magill observed that Giron had restricted wrist flexion and pain with a grind test, but she could flex and extend her digits without difficulty. (*Id.*). In reaching his determination, the ALJ stated that the "newly added treatment records were considered in reducing the residual functional capacity to the sedentary level, but the claimant remains capable of at least frequent fingering and handling with the right hand after her carpal tunnel release, as evidenced by the objective signs, symptoms, and findings in the more recent treatment records

---

[13] *Cf. Hidalgo v. Bowen*, 822 F.2d 294, 295–96, 298 (2d Cir. 1987) (holding that medical opinion based on incomplete medical record was undermined by conflicting opinions from two treating physicians, and may have been altered by review of additional medical records containing clinical findings that confirmed treating physicians' diagnosis), *limited by regulation as stated in Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993); *Blash v. Comm'r of Soc. Sec. Admin.*, 813 F. App'x 642, 644–45 (2d Cir. 2020) (Summary Order) (remanding where ALJ failed to consider whether older, pre-hospitalization evidence, concerning claimant's ability to perform activities of daily life, were rendered stale by post-hospitalization evidence not analyzed by ALJ, which stated that claimant could no longer lift weights, walk long distances, and was limited in carrying out activities of daily life resulting from weakness and fatigue caused by chronic abdominal pain from pancreatitis); *see also Teresi v. Comm'r of Soc. Sec.*, No. 19-cv-1268, 2020 WL 5105163, at *18 (S.D.N.Y. Aug. 31, 2020) (holding that medical opinion "rendered 2 years prior to the [ALJ] hearing" was not stale); *Cepeda v. Comm'r of Soc. Sec.*, No. 19-cv-4936, 2020 WL 6895256, at *10 (S.D.N.Y. Nov. 24, 2020) (same); *Santiago v. Comm'r of Soc. Sec.*, No. 19-cv-2051, 2020 WL 1922363, at *5–6 (S.D.N.Y. Apr. 21, 2020) (same).

discussed above." (*Id.* at 40).  Thus, Dr. Magill's subsequent treatment notes are consistent with Dr. Mercurio's opinion and, therefore, do not raise doubts regarding the reliability (and staleness) of Dr. Mercurio's opinion.

Moreover, even if the Court were to conclude that Dr. Mercurio's opinion was stale, the ALJ's reliance on Dr. Mercurio's opinion was harmless error.  "Remand is unnecessary . . . where application of the correct legal standard could lead to only one conclusion."  *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (alteration and internal quotation marks omitted).  "Where application of the correct legal principles to the record could lead only to the same conclusion, there is no need to require agency reconsideration."  *Id.* (alterations and internal quotation marks omitted).  Here, even if Dr. Mercurio's opinion was stale, Dr. Magill's later added treatment notes support a similar RFC finding as that of Dr. Mercurio, not a more restrictive one.  As noted above, during the September 2020 examination, Dr. Magill observed that Giron had restricted wrist flexion and pain with a grind test, but she could flex and extend her digits without difficulty. (ECF No. 16-3 at 27).  In addition, the staleness of Dr. Mercurio's opinion would not warrant remand because the ALJ's RFC determination was substantially supported by the entirety of the treatment records, which specifically included the subsequent surgical interventions and diagnoses of Kienböck's disease and carpal tunnel syndrome.

Giron also argues that the ALJ's decision to treat Dr. Siddiqui's opinion as unpersuasive for not having the benefit of later submitted evidence, warrants the same finding for Dr. Mercurio's opinion.  (ECF No. 17 at 15–16).  However, this argument ignores that the ALJ found Dr. Siddiqui's opinion unpersuasive for two reasons: (1) "Dr. Siddiqui did not have the opportunity to examine the claimant"; and (2) Dr. Siddiqui did not have "the benefit of later

evidence submitted into the record," i.e., evidence of Kienböck's disease and carpal tunnel syndrome and subsequent treatment.  (ECF No. 16 at 40).  The first reason, on its own, was sufficient to find Dr. Siddiqui's opinion unpersuasive and justifies the ALJ's differing treatment of the two opinions.  If, as the Second Circuit has cautioned, the "ALJ should not rely heavily on the findings of [a] consultative physician[]" who conducts "a single examination of the claimant," *Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013) (per curiam), then it follows, that the ALJ may choose not to rely heavily on the findings of a consultative physician who never examined the claimant at all.[14]  As to the second reason, the ALJ's differing treatment of the two opinions also appears justified.  Dr. Siddiqui's opinion that Giron could perform light work was uncorroborated and inconsistent with the newly added treatment evidence.  (*See* ECF No. 16 at 40).  As the ALJ noted, the "additional treatment records received after the prior hearing do warrant further reducing the residual functional capacity to the sedentary exertional level," and "Dr. Siddiqui's finding rendered on October 31, 2018 after a review of the file is not consistent with other medical evidence now in the file."  (*Id.*).  By contrast, as explained above, Dr. Mercurio's opinion was consistent with the newly added medical evidence that Giron's "right hand is functional with some limitations."  (*Id.*).  Further, by discrediting Dr. Siddiqui's opinion that Giron could perform light work, the ALJ ultimately gave Giron the benefit of the more-reduced RFC of sedentary work.  (*Id.*).  Finally, even if the ALJ's differing treatment of the two

---

[14] The Court is mindful that some courts in this Circuit have held that the opinion of a non-examining physician may be insufficient to support an RFC assessment. *See, e.g.*, *Majdandzic v. Comm'r of Soc. Sec.*, No. 17-cv-1172, 2018 WL 5112273, at *6 (W.D.N.Y. Oct. 19, 2018) ("District courts in this Circuit have stated, as a general proposition, that while reports from nonexamining consultants are entitled to some evidentiary weight, they cannot constitute substantial evidence."). Meanwhile, other courts in this Circuit have held that the opinion of a non-examining physician can constitute substantial evidence where the opinion is otherwise supported by the record. *See, e.g.*, *Morgan v. Comm'r of Soc. Sec.*, No. 20-cv-7124, 2022 WL 1051177, at *8–9 (S.D.N.Y. Jan. 27, 2022), *report and recommendation adopted by* 2022 WL 704013 (S.D.N.Y. Mar. 9, 2022).  However, the Court need not address whether opinions of a non-examining physician can constitute substantial evidence because the ALJ found that Dr. Siddiqui's opinion, which was unfavorable to Giron, was not persuasive.  The Court only addresses the foregoing to explain why the ALJ's differing treatment of the opinions of Dr. Mercurio and Dr. Siddiqui was justified.

doctors was unjustified, the ALJ's error was harmless because Dr. Magill's newly added

treatment notes substantially supported the ALJ's determination.  *See Zabala*, 595 F.3d at 409

(holding that remand is unnecessary where application of the correct legal standard would result

in the same conclusion).

   b.   <u>ALJ's Statement that Giron's Pain Was Treatable with Pain Medication</u>

   In challenging the ALJ's decision to discredit Giron's subjective complaints, Giron also

argues that the ALJ substituted his own judgment regarding the treatability of Giron's pain with

medication.  (ECF No. 17 at 12–14).  Giron correctly observes that "[t]he ALJ cannot arbitrarily

substitute his own judgment for competent medical opinion."  *Schillo*, 31 F.4th at 75; (ECF No.

17 at 13).  However, Giron's contention that the ALJ substituted his own expertise as to Giron's

treatment and use of pain medication fails.  The ALJ observed that Giron's "symptoms have

been managed with treatment, and [Giron] has not generally required pain medication aside from

Ibuprofen and Tylenol."  (ECF No. 16 at 40).  By making this observation, the ALJ did not

substitute his own judgment for a medical opinion, *Schillo*, 31 F.4th at 75, or otherwise "attempt

to forge his own medical opinions based on raw data or reject diagnoses provided by medical

professionals."  *Ramsey v. Comm'r of Soc. Sec.*, 830 F. App'x 37, 38 (2d Cir. 2020) (Summary

Order).  Rather, the ALJ accurately observed, as explained above, that the record reflected that

Giron had experienced symptoms, she was treated for those symptoms, she and doctors reported

improvement, and that the record did not reveal that Giron took or needed any pain medication

beyond Ibuprofen and Tylenol.  (ECF No. 16 at 38–40); *cf. Ramsey*, 830 F. App'x at 38.  As

noted by the court in *Antrip v. Bowen*, there is an "often thin line between an ALJ's legitimate

consideration of medical evidence and his improper substitution of his own 'medical judgment.'"

*Antrip v. Bowen*, 651 F. Supp. 376, 381 (S.D.N.Y. 1987).  But, as in *Antrip*, that line has not

been crossed here. "The ALJ's observations about the true severity of plaintiff's pain as suggested by [her] medications were made in the context of a review of the entire record, including the objective findings and opinions of examining physicians both within and without the Administration." *Id.* Thus, the Court finds that the ALJ did not improperly substitute his own judgment for a competent medial opinion. *Schillo*, 31 F.4th at 75.

      3.  Giron's "Cherry-Picking" Contentions

Giron also argues that, as part of step four, the ALJ erred in determining her RFC by only considering the evidence supportive of the ALJ's determination. (ECF No. 17 at 14–17). When reviewing the medical record, the ALJ may not pick and choose from the record, using only those portions that are favorable to the ALJ's determination. *Fiorello v. Heckler*, 725 F.2d 174, 175–76 (2d Cir. 1983) (reversing and remanding where ALJ credited all medical evidence in favor of non-disability determination but rejected, without reason, all medical evidence in claimant's favor); *accord Lopez v. Dep't of Health & Hum. Servs.*, 728 F.2d 148, 150–51 (2d Cir. 1984) ("We have remanded cases when it appears that the ALJ has failed to consider relevant and probative evidence which is available to him."). Rather, the ALJ's decision must be based on consideration of "all evidence available in [the claimant's] case record." 42 U.S.C. § 423(d)(5)(B). That said, the ALJ need not mention every item of testimony presented, *Rucker v. Kijakazi*, 48 F.4th 86, 100 (2d Cir. 2022), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala*, 595 F.3d at 410.

Giron's "cherry-picking" contentions are meritless. (ECF No. 17 at 14–17, 19). Giron asserts that the ALJ failed to acknowledge record evidence of "new diagnosis, failure of conservative treatment, invasive treatment of injections and surgery," an "EMG from 2019 consistent with bilateral neuropathy at the wrist, with worse neuropathy of the right wrist," and

"objective findings of restricted wrist flexion and extension on exam in 2020." (*Id.* at 16).  She

also claims that the foregoing items contradicted Dr. Mercurio's opinion, which the ALJ

inappropriately credited.  (*Id.*).  However, review of the ALJ's decision demonstrates that the

ALJ considered each of these items.  (*See* ECF No. 16 at 38–39).  The ALJ's decision

specifically went through each of the foregoing items and then concluded, based on all the

evidence, that Giron suffered from medically determinable impairments that could reasonably be

expected to cause the alleged symptoms.  (*Id.* at 40).  However, Giron's statements about the

intensity, persistence, and limiting effects of her symptoms were inconsistent with the record

evidence, which revealed that her symptoms had been managed with treatment and pain

medication.  (*Id.*).  Thus, the ALJ did not fail to acknowledge the foregoing evidentiary items.

Giron further asserts that the ALJ failed to consider "observed moderate edemas on

[Giron's] right hand," a March 2018 left wrist MRI "showing avascular necrosis and prominence

of scapholunate ligament,"[15] Giron's "painful and limited range of motion . . . *after* right

shoulder arthroscopy," and the MUA procedure.  (ECF No. 17 at 16–17).

As to the "observed moderate edemas," Giron provides one record citation to substantiate

this condition.  (*See* ECF No. 16-1 at 29; *see also id.* at 65, 144).  The record confirms that on

January 19, 2018, Dr. Blumenthal "observed and felt moderate edema on [Giron's] right hand."

(*Id.* at 29, 65, 144).  While the ALJ did not address Dr. Blumenthal's January 2018 edema

observation,[16] remand is unwarranted because the ALJ need not "mention[] every item of

---

[15] Giron's filing incorrectly identified the date of this MRI as May 2018.  (*Compare* ECF No. 16-1 at 35, *with* ECF
No. 17 at 17, 17 n.47).

[16] Although Giron does not challenge the weight the ALJ provided to Dr. Blumenthal's numerous opinions, the
Court briefly addresses this issue in the interest of completeness.  The ALJ observed that Dr. Blumenthal provided
forms where he checked off boxes, indicating that Giron was totally disabled and may not return to work.  (*See* ECF
No. 16 at 40–41).  The ALJ did not address Dr. Blumenthal's opinions because they were vague and conclusory.
(*Id.* at 41).  Under the Regulations, a better explained medical opinion, as a general matter, is given more weight.
*See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical

testimony presented to him." *Rucker*, 48 F.4th at 100.  Dr. Blumenthal provided no explanation

as to the nature, persistence, and cause of the edema.  (*See* ECF No. 16-1 at 29, 65, 133).

Moreover, Dr. Blumenthal's subsequent notes from February, March, April, June, July, August,

and September 2018 did not state whether Giron still had that edema.  (*See id.* at 163, 168, 177,

188, 201, 204, 212, 215, 220; ECF No. 16-3 at 4, 132).  As to the wrist MRI in March 2018, the

MRI was of Giron's *left* wrist, but Giron did not allege that her left wrist was contributing to her

alleged disability and the record does not contain evidence that Giron complained about or was

treated for her left wrist.  Finally, as to the right shoulder arthroscopy, Dr. Wert's treatment notes

reflect that Giron had normal range of motion after the surgery, (ECF No. 16-1 at 56, 58), and as

to the MUA, Giron denied back pain during her subsequent visits with Dr. Magill, (ECF No. 16-

3 at 27, 30, 33, 39, 41, 44, 47, 50, 74, 81, 83, 95, 100–01, 105, 107, 109, 113, 115–17, 120).

Accordingly, Giron's claims of "cherry-picking" are meritless.

**B.      The ALJ Committed No Error in Assessing the Vocational Expert's Testimony.**

The ALJ is required to "inquire into all those areas where the [vocational] expert's

testimony *seems* to conflict with the *Dictionary*."  *Lockwood v. Comm'r of Soc. Sec. Admin.*, 914

F.3d 87, 92 (2d Cir. 2019) (alterations and internal quotation marks omitted).  That is, an ALJ

has an "independent, affirmative obligation . . . to undertake meaningful investigatory effort to

uncover apparent conflicts, beyond merely asking the vocational expert if there is one."  *Id.* at 94

(alterations and internal quotation marks omitted).

Giron argues that the ALJ failed to resolve a conflict between the vocational expert's

testimony and the language requirements provided by the DOT Code meant to represent work in

---

opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion.  The
better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion.");
*Colgan v. Kijakazi*, 22 F.4th 353, 361, 361 n.5 (2d Cir. 2022).  Because Dr. Blumenthal's opinions provided
minimal, if any, explanation in support, the ALJ appropriately discounted those opinions.

significant number that Giron can perform. (ECF No. 17 at 17–19). Giron explains that the three positions that the vocational expert testified that she could perform (assembler, polisher, and inspector) all require Level 1 language skills, meaning the recognition of 2,500 words and the ability to read 95 to 120 words per minute. (*Id.* at 18). However, Giron is unable to read or write simple messages or instructions in English and she required a translator for the ALJ hearings. (*Id.* at 19). The ALJ did not address this potential conflict, but as explained below, the ALJ need not have done so.

The three positions the vocational expert testified that Giron could perform do require Level 1 language skills, which the DOT Code defines as the ability to "[r]ecognize [the] meaning of 2,500 (two- or three-syllable) words" and to "[r]ead at [a] rate of 95–120 words per minute." *Final Assembler*, DICTIONARY OF OCCUPATIONAL TITLES, Code 713.687-018, 1991 WL 679271 (4th ed. 1991); *Polisher, Eyeglass Frames*, DICTIONARY OF OCCUPATION TITLES, Code 713.684-038, 1991 WL 679267 (4th ed. 1991); *Dowel Inspector*, DICTIONARY OF OCCUPATION TITLES, Code 669.687-014, 1991 WL 686074 (4th ed. 1991). However, none of these positions explicitly provide that *English* language skills are required. *See id.* Thus, Giron's inability to read or understand English does not bar her from being able to perform the duties of these three positions. Accordingly, there was no conflict between the DOT Codes and the vocational expert's testimony.

Additionally, under step five, the ALJ was not required to consider Giron's ability to read and understand English when evaluating Giron's education and determining whether Giron would be able to adjust to other work. Under a previous iteration of 20 C.F.R. § 404.1564, the ALJ was required to "consider a person's ability to communicate in English" when evaluating what work, if any, the person can perform. 20 C.F.R. § 404.1564(b)(5) (2019); *see Vega v.*

*Harris*, 636 F.2d 900, 904 (2d Cir. 1981) (per curiam) ("If Vega is also illiterate or 'unable to communicate in English,' then the [1980 version of the] medical-vocational guidelines mandate a determination of disability.").  However, the 2020 amendment of § 404.1564(b) omits this requirement.[17]  Therefore, the ALJ was not required to address Giron's English language skills.

## CONCLUSION

For the foregoing reasons, the Commissioner's motion is **GRANTED** and Giron's motion is **DENIED**.

The Clerk of Court is respectfully directed to terminate the pending motions, ECF Nos. 17 and 22, and to close this case.

**SO ORDERED.**

DATED:     White Plains, New York
           September 19, 2023

_____
VICTORIA REZNIK
United States Magistrate Judge

---

[17] In explaining this change, the Social Security Administration stated,

> We are eliminating a rule that reflected the existence of jobs in the economy for certain individuals who were unable to communicate in English at the time we issued it in 1978.  The final rule we are adopting today simply reflects the changes in the national workforce since 1978, and the greater existence of jobs for individuals with [limited English proficiency].  When the final rule takes effect, we will no longer consider an individual's English proficiency when determining an individual's education.  Such a rule does not preclude individuals with [limited English proficiency] from having meaningful access to our programs; it merely updates our rules to reflect that an inability to communicate in English is no longer a useful indicator of an individual's educational attainment or of the vocational impact of an individual's education.

*Removing Inability to Communicate in English as an Education Category*, 85 Fed. Reg. 10586, 10597 (Feb. 25, 2020).  The Administration also noted that data showed that "1 million individuals with [limited English proficiency], including those who speak no English," are represented in many occupations.  *Id.* at 10591.  Finally, the Administration found that "employers do find a way to communicate with [limited English proficiency] employees, indicating that [limited English proficiency] is not a barrier to all types of employment."  *Id.*